UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TINA LIMLE,

    Plaintiff,

v.                                                    CASE NO. 8:17-cv-273-T-30MAP

NANCY BERRYHILL,
Acting Commissioner of Social Security,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff seeks judicial review of the Commissioner's decision denying her claim for disability insurance benefits (DIB) and supplemental security income (SSI). She makes several arguments on appeal: (1) the ALJ erred in not finding Plaintiff's mental limitations to be severe at step two, and erred in incorporating her mental limitations into her residual functional capacity (RFC) at steps four and five; (2) the ALJ improperly rejected the opinions of her treating psychiatrist and nurse practitioner; and (3) the ALJ posed an incomplete hypothetical question to the vocational expert (VE). After considering the record, I agree with Plaintiff on her first argument. Accordingly, I recommend that the Court remand the Commissioner's decision for further proceedings.[1]

---

[1] This matter was referred to me under Local Rule 6.01(c)(21).

*A. Background*

Plaintiff, who was 45 years old at the time of the administrative hearing, has a high school education and some college and has past relevant work as a waitress, stock clerk, and electronics assembler. She alleges she has been unable to work since January 1, 2011, due to bipolar disorder with psychosis, anxiety, and back pain.[2] (R. 128) The ALJ found Plaintiff suffered from the severe impairment of degenerative disc disease with minimal disc herniation in the cervical and lumbar spine. (R. 20) The ALJ determined that Plaintiff is not disabled as she has the RFC to perform a less than full range of light work as follows:

> She is limited to lifting a carrying ten pounds continuously and twenty pounds occasionally, and she can sit for four (4) hours continuously without interruptions, stand for two (2) hours and walk for two (2) hours in an eight-hour day, as well as ambulate without the use of a cane on level surfaces for half a mile, despite needing an assistive device as being medically necessary. She is further limited to frequent reaching, including overhead reaching, but can continuously handle, finger, feel, and push/pull with the bilateral upper extremities, as well as operate foot controls continuously. In regard to postural activities, the claimant is limited to occasional climbing of stairs and balance, but she is precluded from climbing ladders or scaffolds, and she can never stoop, kneel, crouch, or crawl.

(R. 23) The ALJ concluded that, with this RFC, Plaintiff could not perform her past relevant work but could work as a surveillance system monitor, an order clerk, and a telephone information clerk. (R. 29) Plaintiff administratively appealed, and the Appeals Council denied review. With the ALJ's decision being the Commissioner's final one, Plaintiff filed

---

[2] This is Plaintiff's second round of applications. In her previous SSI and DIB applications, she alleged disability beginning July 11, 2008. An ALJ denied these applications in a September 16, 2010 decision. (*See* R. 17) Plaintiff's date of last insured (DLI) for the purposes of this appeal was December 31, 2013. (*Id.*)

this action seeking judicial review.

B.  *Standard of Review*

To be entitled to DIB and/or SSI, a claimant must be unable to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, in order to regularize the adjudicative process, promulgated detailed regulations that are currently in effect. These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Under this process, the Commissioner must determine, in sequence, the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment(s) (*i.e.*, one that significantly limits her ability to perform work-related functions); (3) whether the severe impairment meets or equals the medical criteria of Appendix 1, 20 C.F.R. Part 404, Subpart P; (4) considering the Commissioner's determination of claimant's RFC, whether the claimant can perform her past relevant work;

and (5) if the claimant cannot perform the tasks required of her prior work, the ALJ must decide if the claimant can do other work in the national economy in view of her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant is entitled to benefits only if unable to perform other work. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987); 20 C.F.R. § 404.1520(f), (g); 20 C.F.R. § 416.920(f), (g).

In reviewing the ALJ's findings, this Court must ask if substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The ALJ's factual findings are conclusive if "substantial evidence consisting of relevant evidence as a reasonable person would accept as adequate to support a conclusion exists." *Keeton v. Dep't of Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citation and quotations omitted). The Court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds the evidence preponderates against the ALJ's decision. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining the proper legal analysis has been conducted mandates reversal." *Keeton*, 21 F.3d at 1066 (citations omitted).

C. Discussion

1. *Severity and Step Two*

Under the heading, "The ALJ Erred in Evaluating the Severity of Plaintiff's Mental Impairments" (doc. 18 at 2), Plaintiff makes three arguments: the ALJ should have classified her bipolar disorder as a severe impairment; the ALJ should have incorporated Plaintiff's

4

bipolar-related limitations into her RFC; and the ALJ improperly discounted the opinions of treating psychiatrist Dr. Hemsath and treating nurse practitioner Donna Dempsey, A.R.N.P., in favor of the opinion of one-time examiner and forensic psychologist Linda Appenfeldt, Ph.D. The Commissioner argues that substantial evidence supports both the ALJ's step two determination that Plaintiff's bipolar disorder is non-severe, and his consideration of Plaintiff's mental impairments in later steps. The Commissioner also contends that the ALJ had good cause to discount the treating source opinions (doc. 21).

Plaintiff's emphasis on step two misses the mark to some extent.[3] Step two requires only that the ALJ determine whether Plaintiff suffers from at least *one* severe impairment. *See Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) (holding "the finding of any severe impairment . . . whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe" is enough to satisfy step two). Here, once the ALJ found that Plaintiff suffered from the severe impairment of degenerative disc disease, step two was satisfied; the ALJ appropriately continued through the sequential analysis.[4]

---

[3] Plaintiff's burden of proving severity is a light one. The Eleventh Circuit has held that "a claimant's impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986); *see also* 20 C.F.R. §§404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

[4] Interestingly, the ALJ who ultimately denied Plaintiff's previous applications found that Plaintiff's bipolar disorder was a severe impairment. (R. 30)

But the ALJ still needed to consider Plaintiff's bipolar disorder and anxiety past step two. To backtrack, when an ALJ evaluates a claimant's mental impairments at steps two and three, he employs a special technique (called the Psychiatric Review Technique, or PRT) to assess the claimant's functional limitations in four areas: social functioning; activities of daily living; concentration, persistence, or pace; and episodes of decompensation. *See Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005). The ALJ incorporates the results of the PRT into his findings and conclusions at steps four and five of the sequential evaluation process. *See Jacobs v. Comm'r of Soc. Sec.*, 520 F. App'x 948, 950 (11th Cir. 2013). But the PRT is separate from the ALJ's evaluation of a claimant's RFC, which is an assessment of a claimant's maximum ability to do work despite her impairments. The mental RFC is a more detailed assessment of the claimant's ability to function. *Winschel*, 631 F.3d at 1180. In other words, an ALJ must be more thorough in evaluating a claimant's RFC at step four than in assessing the severity of mental impairments at steps two and three. *Winschel*, 631 F.3d at 1180; *see also* SSR 96-8p, 1996 WL 374184 (July 2, 1996).

The more appropriate starting point for my analysis is the ALJ's evaluation of Plaintiff's RFC to do other work in the economy at steps four and five.[5] This segues into

---

[5] The ALJ employed the PRT and found that: Plaintiff had mild difficulties in her activities of daily living (she could cook, clean, drive occasionally, and shop for groceries); mild limitations in social functioning (she occasionally left the house to grocery shop but otherwise avoided people); mild limitations in concentration, persistence, and pace (her memory was intact, she could pay attention to a task for 20 to 30 minutes, and she could perform simple math); and no episodes of decompensation. (R. 21-22) The ALJ emphasized that "[t]he mental [RFC] assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing the various functions contained in

Plaintiff's second argument that the ALJ improperly considered her bipolar disorder and anxiety in fashioning her RFC.[6] To determine Plaintiff's RFC, the ALJ must consider all the record evidence and examine what effect the Plaintiff's severe and non-severe impairments had on what she was able to do. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). The ALJ should consider any medical opinions given by physicians, psychologists or other acceptable medical sources, which indicate the nature of a person's impairments. 20 C.F.R. §§ 404.1527, 416.927. The ALJ, of course, must support his findings by substantial evidence. In the end, the RFC determination is reserved for the ALJ. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c).

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011) (quoting 20 C.F.R. § 404.1527(a)(2)). A court must give a treating physician's opinions

---

the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." (R. 22)

[6] At the administrative reconsideration level, the agency found that Plaintiff had severe mental impairments resulting in: mild restrictions to her activities of daily living; moderate social functioning limitations; moderate limitations to concentration, persistence, or pace; and one or two episodes of decompensation. (R. 134)

substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause for disregarding such opinions "exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citation omitted). With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate the reasons for doing so." *Winschel*, 631 F.3d at 1179 (*quoting Phillips v. Barnhart*, 357 at 1240 n.8). Additionally, the ALJ must state the weight given to different medical opinions and the reasons therefor. *Id.*; *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). Otherwise, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). Finally, the opinions of examining physicians are given more weight than non-examining physicians, treating more than non-treating physicians, and specialists more than non-specialist physicians. 20 C.F.R. §§ 404.1527(c)(1-5), 416.927(c)(1-5).

Plaintiff's mental health treatment records fill most of the 1,122-page administrative record. The relevant time period for this appeal begins January 1, 2011 (Plaintiff's alleged onset date), but her mental health treatment really began when she was a child.[7] Abused by her father and placed in Ohio's foster care system, Plaintiff started outpatient mental health

---

[7] Plaintiff's DLI for DIB purposes is December 31, 2013. (R. 17) She must prove disability by this date to be eligible for DIB benefits.

treatment, including medication, at 12. (R. 1018) After high school, she spent a year in the United States Marine Corps (she recalls that she enlisted during a manic episode), where she reported being raped and eventually honorably discharged due to medical issues (flat feet). (R. 1019) After that came a series of convictions: for nitrous oxide possession (Plaintiff was inhaling whip-its; her brother found hundreds of whip-it containers in her trash at one point); aggravated stalking (Plaintiff explains that she married a man during a manic episode who took her with him to stalk his ex-girlfriend); indecent exposure (she was caught running naked down the street); and DUI. The September 11, 2001, attacks on the World Trade Center apparently triggered a manic state. She quit her job that day and started volunteering with Florida Blood Services. (R. 535) She says she worked three days straight for the organization without sleeping or taking a break. When she refused to go home, she was taken to Sun Coast Hospital under a Baker Act hold. (R. 430, 534-35) In another incident, her family called 911 after she wrote multiple letters and emails to President Bush and Vice-President Cheney claiming that the CIA and FBI were following her and had bugged her phone. (R. 442) She complained of auditory and visual hallucinations and was sleeping only one to two hours every night. Her hospital records from that time indicate that she had been heavily abusing nitrous oxide and that it was at least her fifth psychiatric hospitalization. (R. 435, 532) In 2003, she was Baker Acted again after she reported auditory and visual hallucinations – voices were telling her to "kill them" – and she walked into the Largo police station carrying a .45 caliber handgun. (R. 531)

She was homeless on and off after this; a bio-psychosocial assessment completed by

staff at the Boley Center (a mental health and homeless services center) states that by 2010, when she started in the Boley treatment and housing program, Plaintiff had been homeless at least 4 times in the past 2 years. (R. 642, 648) But under a medication regime that included Tegretol, Nexium, Zoloft, Lithium, Seroquel, an ProAir inhaler, and Vistaril (R. 641-42), she had no psychiatric hospitalizations from 2010 until 2014, and she at last acknowledged through therapy that when she stops taking her medication and starts using drugs, she becomes manic and ends up in the hospital. (R. 542)

Boley provided Plaintiff with housing, mental health treatment (including delivering her medications to her apartment), access to a social worker, weekly group therapy, access to AA and NA meetings, career counseling, and regular, mandatory in-home visits with a counselor to assess her well being. Boley staff members Dr. Hemsath and Debra Dempsey, A.R.N.P. treated Plaintiff consistently from September 2010, through April 2015. Plaintiff improved in this structured setting. Although she still had mood swings and some manic episodes, she made progress toward mental health, stayed sober, and even went to community college part-time for a brief stint.

There were of course highs and lows. In late 2010 and early 2011, she reported to Boley staff (including Dr. Hemsath) that she was experiencing auditory hallucinations. She claimed voices told her that someone put a bug in her phone so she threw the phone away. (R. 634) She reported depression and fatigue and in January 2011, and she was sleeping 15 to 16 hours per day. The next month, her therapist advised her against looking for a job because "she still believes she is part of a government conspiracy." (R. 631) But then in

10

March 2013, Dr. Hemsath noted that Plaintiff was studying hotel management part-time at St. Petersburg College. "She is sleeping well. She feels good. She is having no mood swings. She denies any auditory hallucinations or experiences of *deja vu.* She is four years clean and sober." (R. 642)

By the beginning of 2014, she reported delusions and paranoia again; she was fearful of losing her grip on reality and returning to the hospital or prison. (R. 734, 741-42) A May 2014 progress note from Ms. Dempsey states that Plaintiff said "she doesn't feel right" – she was vomiting, depressed, anxious, and speaking rapidly. (R. 753) In a December 2014 medical source statement, Ms. Dempsey opined that Plaintiff had a Global Assessment of Functioning (GAF) score of 40;[8] was severely limited in her ability to remember work-like procedures; was severely limited in her ability to understand, remember, and carry-out simple instructions; and was severely limited in her ability to show up to work on time, stay within schedule, and work near others. (R. 938-39) According to Ms. Dempsey, Plaintiff was completely unable to concentrate for 2 hours at a time and unable to complete a normal work day. (R. 938) Dr. Hemsath agreed with this assessment. (R. 1122) Sure enough, by April

---

[8] The GAF is a scale from 0 to 100 where higher scores indicate greater levels of functioning. After a 12-year revision process, the DSM-5 Task Force "recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *See DSM-5,* 16 (5th ed. 2013). In place of the GAF scale, the DSM-5 includes the World Health Organization Disability Assessment Schedule (WHODAS) to "provide a global measure of disability." *Id*. Nonetheless, the ALJ noted the GAF assessed by one-time examiner, Dr. Appendfeldt (GAF of 69), but did not consider the much lower ones included in Plaintiff's treatment records (GAF of 35, 40). (R. 614, 938)

2015, Plaintiff was "hypomanic, if not full blown manic" during an appointment with Ms. Dempsey. (R. 1031) That same day, Plaintiff's therapist observed that "it appeared [Plaintiff] was having a manic episode." (R. 1034)

At the agency's request, Dr. Appenfeldt conducted a one-time consultative examination of Plaintiff in June 2015. Dr. Appenfeldt observed that Plaintiff did not appear to be a danger to herself or others; had a normal level of sustained concentration, persistence, understanding, and memory; exhibited no symptoms of mania or hypomania; and had an intact remote and recent memory. (R. 1115) She opined that Plaintiff's emotional and psychological prognosis was "considered to be good" (R. 1116); she had a GAF of 69; and Plaintiff was capable of simple, repetitive, unskilled tasks involving understanding, memory, sustained concentration and persistence, social interaction, and adaptation. (R. 1117)

Dr. Appenfeldt's findings were based on her examination of Plaintiff and also on Plaintiff's self-reported mental health history. In fact, the only records Dr. Appenfeldt consulted were from a supportive housing program Plaintiff was enrolled in from October to November 2014, and notes from two of Plaintiff's appointments with Dr. Hemsath (October 27, 2014, and January 16, 2015). (R. 1116) Dr. Appenfeldt wrote: "The most accurate diagnosis for this claimant would be obtained from multiple settings and sources, including complete history. Therefore, additional review of all records is advised. . . . Ms. Limle has a history of both inpatient and outpatient mental health treatment and review of all those records could augment the clinical picture." (R. 1117) Plaintiff's attorney pointed out to the ALJ that the records Dr. Appenfeldt reviewed were "just not even a snapshot" (R.

76) of Plaintiff's mental health history. The ALJ appears to agree: "Okay. I'll probably go ahead and send all this information to Apenthal [sic] and see if we can get another report if that changes the day. . . . And I'll make a decision after that." (R. 77) An updated report from Dr. Appenfeldt is not in the record.

Nonetheless, the ALJ gave Dr. Appenfeldt's opinion "significant weight because it was based on a very thorough clinical evaluation and mental status examination, including a review of *some of* the claimant's records from Boley Centers." (R. 21) (emphasis added) The ALJ also emphasized that Dr. Appenfeldt "is a highly qualified board-certified forensic psychologist, who routinely performs consultative evaluations at the request of the disability determination's agency and is familiar with the regulations dealing with Social Security disability." (*Id*.) In contrast, the ALJ assigned little weight to Ms. Dempsey's and Dr. Hemsath's December 2014 medical source statement that concluded Plaintiff had much more severe limitations than those Dr. Appenfeldt recognized. (*Id*.) According to the ALJ, Dr. Hemsath and Ms. Dempsey's conclusions are not only unsupported "by the overall medical evidence of record" but are also part of a mere check-the-box form with "no explanation." (*Id*.)

Once he decided that Plaintiff's mental impairments were not severe and assessed Plaintiff's PRT, the ALJ crafted an RFC for Plaintiff that took into account only her physical limitations. (R. 23) The ALJ noted: "The claimant alleges disability based on her inability to do even sedentary work due to degenerative disc disease in her cervical and lumbar spine. Although she also claimed being disabled due to mental health impairments, the unsigned

13

has found these impairments not severe, as discussed above." (R. 24) This is where the ALJ's consideration of Plaintiff's mental impairments stops. This decision to exclude limitations related to Plaintiff's bipolar disorder is not supported by substantial evidence. The treatment notes are clear that Plaintiff can sustain her mental health only when living in a highly structured, supervised, and supportive environment. Before the Boley Center was a part of Plaintiff's life, she was either in the hospital, in jail, or homeless. To say that her mental impairments do not impact her RFC in any way is to ignore the obvious fact that Plaintiff's entire life is structured to beat back the voices in her head.

Compounding this error is the ALJ's rejection of Dr. Hemsath and Ms. Dempsey's opinion, which infected the ALJ's RFC determination and is not supported by good cause. The ALJ dismissed their opinion as "conclusory" and "check-the-box" – but it was informed by and consistent with 5 years of treatment history. What is more, non-treating Dr. Appenfeldt (on whose opinion the ALJ placed great weight) did not have a complete picture of Plaintiff when she rendered her opinion, a fact she noted as a problem. And because the ALJ did not account for Plaintiff's need for a highly structured environment, he found inconsistencies between Dr. Hemsath and Ms. Dempsey's opinion, on the one hand, and Dr. Appenfeldt's, on the other, that actually typify the behavior of someone suffering from chronic psychotic mental impairments like Plaintiff. *See Mace v. Comm'r of Soc. Sec.*, 605 F. App'x 837, 843-44 (11th Cir. 2015). In other words, in rejecting Dr. Hemsath and Ms. Dempsey's opinion in favor of Dr. Appenfeldt's, the ALJ overemphasized Plaintiff's good days without regard for her bad days. The Boley records reflect the episodic nature of

Plaintiff's bipolar disorder, a nuance the ALJ did not discuss. The ALJ's consideration of Plaintiff's mental impairments in fashioning her RFC is not supported by substantial evidence. And in concluding that Plaintiff's mental impairments do not impact her ability to work, the ALJ rejected Dr. Hemsath and Ms. Dempsey's opinion without good cause.

### D. Conclusion

I recommend:

1. The decision of the Commissioner be REVERSED and the case be REMANDED for further administrative proceedings; and

2. Judgment be entered in favor of Plaintiff.

IT IS SO REPORTED at Tampa, Florida on December 12, 2017.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.